FILED

AO106 (Rev. 12/03) Affidavit for Search Warrant

08 MAR -5 PM 5:13

CLERK, U.S. DISTRICT COURT

ORDERED SEALED BY COURT

unsealed on 4/17/08

DEPUTY

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

4834 Saratoga Avenue
San Diego, CA

APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

Case Number: '08 MJ 0695

I, Special Agent Christopher K. Sedmak being duly sworn depose and say:

I am a(n) Special Agent for the Federal Bureau of Investigation (Official Title) and have reason to believe

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the SOUTHERN District of CALIFORNIA

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed; and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title 21 / 18 United States code, Section(s) 841(a)(1) and 846 / 1956

The facts to support a finding of probable cause are as follows:

See the attached Affidavit of Special Agent Christopher J. Sedmak

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

Signature of Affiant

Sworn to before me and subscribed in my presence,

March 5, 2008 (Date) at San Diego, California (City, State)

Hon. Cathy Ann Bencivengo (Name of Judge) U.S. Magistrate Judge (Title of Judge)

Signature of Judge

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises located at 4834 Saratoga Avenue, San Diego, California is a single story family residence located on Saratoga Avenue in San Diego, California. The residence has a beige colored exterior with brown trim and a brown shingled roof. The numerals "4834" are visible on the exterior wall of the residence to the right of the front door, facing Saratoga Avenue

The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises, evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers, or registration for such vehicles in the name of the occupants including a gray 1995 Toyota pick-up, bearing California license plate number 5B46370 registered to Joel BANNING.

# ATTACHMENT B

## ITEMS TO BE SEIZED

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

4. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

5. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

6. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

7. Packages and contents that were delivered to the residence, or were about to be sent by the occupants.

8. Drug paraphernalia and distribution materials such as scales, plastic baggies, electrical and duct tape, and other odor masking materials.

9. Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards.

10. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

11. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

12. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

13. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

14. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

a. telephone numbers of incoming/outgoing calls stored in the call registry;

b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

c. Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956;

d. telephone subscriber information;

e. the telephone numbers stored in the cellular telephone and/or PDA; and

f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

**UNITED STATES OF AMERICA** )
) **SS**
**SOUTHERN DISTRICT OF CALIFORNIA** )

I, Christopher J. Sedmak, being duly sworn, hereby depose and say:

1. I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by special agents of the Federal Bureau of Investigation ("FBI") and the United States Drug Enforcement Administration ("DEA") for the premises located at 4834 Saratoga Avenue, San Diego, California (hereafter "the target location") described further in Attachment A.

2. Joel Joshua BANNING ("BANNING") is the occupant of the target location. On February 22, 2008, BANNING was indicted by the federal grand jury for the Southern District of California and charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute oxycodone[1/] and hydrocodone bitartrate[2/] in violation of 21 U.S.C. §§ 846 and 841(a)(1) in violation 21 U.S.C. §§ 846 and 841(a)(1).

3. The purpose of the search warrant is to seize (1) property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

---

[1/] Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine. It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2/] Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord. Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances. Controlled purchases and seizures conducted over the course of this investigation to date have involved commercially prepared tablets of hydrocodone bitartrate with acetaminophen, consisting of less than 15 mg hydrocodone per dosage unit and constitute Schedule III controlled substances. All references found herein to "hydrocodone" refer to tablets consisting of hydrocodone bitartrate with acetaminophen.

4. The information contained in this affidavit is based on my personal experience and training, consultation with other special agents of FBI, DEA, the Criminal Investigation Division of the Internal Revenue Service ("IRS"), officers of the San Diego Police Department ("SDPD") and other law enforcement officers. The evidence and information contained herein was developed from a review of intercepted wire and electronic communications pursuant to prior district court authorization, interviews with sources of information, financial documents secured by grand jury subpoena, surveillance records, vehicle records from the California Department of Motor Vehicles ("DMV"), and public records. Agents' interpretation of code words and phrases are described in brackets ("[]").

## EXPERIENCE AND TRAINING

5. I have been employed as a Special Agent with the FBI since September of 2002. I am currently assigned to the San Diego Field Division working as a member of the San Diego Organized Crime Squad. I have received 16 weeks of training at the FBI Academy in Quantico, Virginia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillance, utilized electronic and video surveillance, and testified in federal and state courts. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking.

6. In the course of my law enforcement experience, I have participated in investigations of crimes involving the importation and distribution of controlled substances and money laundering. I have arrested and participated in the arrests of numerous individuals for various controlled substance violations. I have participated in the execution of search warrants relating to illegal drug offenses. I have received training in the methods used by drug traffickers to import and distribute conceal controlled substances and launder drug proceeds to promote the drug trafficking activity and conceal or disguise the nature, source, and ownership of the drug proceeds. I have conducted and participated in numerous investigations involving surveillance of individuals associated with drug trafficking. I have conducted and participated in numerous interviews of individuals involved with drug trafficking.

7. Based upon my experience and training, consultation with other law enforcement officers experienced in controlled substances and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

a. Individuals involved in drug trafficking often maintain at their residence records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and coconspirators.

b. Individuals involved in drug dealing must often rely on others to obtain the controlled substances and to help them market the drugs and evidence of the identities of these criminal associates is often maintained at their residence and/or place of business.

c. Individuals involved in drug dealing utilize cellular telephones and personal digital assistants ("PDAs") to maintain contact with co-conspirators and to conduct their criminal activity. Drug traffickers use cellular phones and PDAs, in part, because of their belief in the inability of law enforcement personnel to simultaneously track the originating and destination phone numbers of calls placed to and from their cellular phones and PDAs. Cellular telephones and PDAs contain wire and electronic data concerning telephonic contact, text messages, and electronic mail messages with co-conspirators, as well as telephone books containing contact information for co-conspirators. Members of drug trafficking and distribution organizations also utilize cell phones and PDAs with photograph and video capabilities to take photographs and videos of other members of drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds.

d. Based on prior searches of premises used by individuals involved in drug trafficking, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

e. Individuals involved in drug trafficking will often conceal contraband and evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

f. Individuals involved in drug trafficking earn sums of money and often maintain large amounts of United States Currency at their residence and often hide United States Currency in safes, false compartments, and other locations inside their home. Individuals involved in drug trafficking also try to conceal and disguise the nature, source, and ownership of drug proceeds in a variety of ways including: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; and (3) using the money to buy assets which are hard to trace. Substantial sums of United States Currency and records of financial transactions are often found at the residence maintained by drug traffickers.

g. Individuals involved in drug trafficking often send and receive packages that contain contraband, money orders, and United States Currency. Packages that contain contraband, money orders, and United States Currency are often found at residences maintained by drug traffickers.

h. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the residences listed within this warrant and it's attachment(s) for and to seize photographs that law enforcement agents determine to be of evidentiary value.

i. Individuals engaging in drug transportation often use computers to communicate with co-conspirators by means of electronic mail ("e-mail") and for the storage of records. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard drives. Therefore, I am requesting permission to seize computers, including printers, monitors, keyboards, scanners, and all forms of media storage that may be found at the residence.

8. It is also my opinion and belief that the above-described documents are permanently possessed by drug traffickers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the residence despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

9. The investigation into the criminal activities of Joel Joshua BANNING and others reveals that the drug conspiracy continued for at least seven months and that BANNING received substantial amounts of pharmaceuticals. Consequently, I believe that there will be current as well as historical records of drug trafficking and money laundering at the target location.

## OVERVIEW OF THE TARGET SUBJECTS

10. The following is a brief description of Joel Joshua BANNING and Karl DeLeon MURRAH – the two target subjects whose drug trafficking activities provide probable cause for the search warrant on the target location.

a. **Joel Joshua BANNING** was a regular customer of Karl Deleon MURRAH and distributed hydrocodone to others. BANNING is charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute oxycodone and hydrocodone in violation of 21 U.S.C. §§ 846 and 841(a)(1)

b. **Karl DeLeon MURRAH** received large quantities of pharmaceuticals from at least February 2007 through August 2007 and then sold the pharmaceuticals to other individuals for further distribution. MURRAH is charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute oxycodone and hydrocodone in violation of 21 U.S.C. §§ 846 and 841(a)(1), and distribution of hydrocodone in violation 21 U.S.C. § 841(a)(1). MURRAH is also charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and with distribution of MDMA (Ecstasy), and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).

## FACTS ESTABLISHING PROBABLE CAUSE

11. Agents determined that BANNING was a customer of Karl MURRAH through intercepted telephone calls, surveillances, and a drug seizure that resulted in BANNING getting arrested and convicted for transportation/sale of controlled substances. Toll data from June 2006 to November 2007 reflects approximately 895 contacts between BANNING and MURRAH. Agents intercepted at least 20 drug related calls between MURRAH and BANNING from February 2007 to September 2007. Based on wire interceptions, agents estimate that BANNING purchased hydrocodone tablets from MURRAH at least 13 times. Agents estimate that BANNING purchased approximately 20,500 tablets of hydrocodone tablets from MURRAH

12. On February 8, 2007, DEA Agents conducted a surveillance in the area of MURRAH's residence, 897 Yosemite Drive, Chula Vista, California. On February 8, 2007, at approximately 2:10 p.m., monitors intercepted a call between MURRAH and BANNING. During the call, BANNING told MURRAH that he wanted to come by and pick up some "things." Later that day, at approximately 6:35 p.m., agents observed a Toyota Celica, which was registered to BANNING, arrive in the vicinity of the Yosemite address. BANNING was then observed exiting the vehicle and entering the residence.

13. On February 12, 2007, agents intercepted a call between MURRAH and BANNING regarding a hydrocodone deal. MURRAH asked BANNING whether "it was one or two" [1,000 or 2,000 hydrocodone tablets]. BANNING replied, "one."

14. On July 16, 2007, agents intercepted call between MURRAH and BANNING regarding the sale of 8,000 hydrocodone tablets. During the call, MURRAH asked BANNING whether he was "sure 8 for sure then?" [8,000 hydrocodone tablets]. BANNING replied "actually it is going to be 6" [6,000 hydrocodone tablets] and then probably "two" [2,000 hydrocodone tablets] tomorrow, but one [1,000 tablets of hydrocodone bitartrate] definitely tomorrow." MURRAH confirmed that BANNING wanted "6 [6,000 hydrocodone tablets] today [July 16, 2007] and then 2 [2,000 hydrocodone tablets] tomorrow [July 17, 2007]?" Agents subsequently set up surveillance and observed BANNING meet with MURRAH. During the meeting, MURRAH took something out of the trunk of his BMW, opened the passenger door and leaned into BANNING's truck.

15. On July 16, 2007 SDPD Officers stopped BANNING for a traffic violation and seized various pharmaceuticals including over 2,000 hydrocodone tablets, and 5 tablets of 80mg oxycodone. BANNING subsequently pled guilty to transportation or sale of controlled substances in violation of Cal. Health & Safety Code § 11352 and was sentenced to 3 years probation.

16. On July 25, 2007, at approximately 10:10 p.m., monitors intercepted a call from MURRAH to BANNING. During the call, MURRAH told BANNING, "That is all that is there, 25." Agents believe that, in this call, MURRAH told BANNING that there are only 2,500 tablets available for sale. BANNING told MURRAH, "That is fine. I will take them. I don't care." This conversation took place approximately nine days after BANNING was arrested for possession charges.

17. On August 20, 2007, at approximately 3:03 p.m., monitors intercepted a text from BANNING to MURRAH using TT-1. The text read, "HEY LIKE I SAID NOT TO BUG YOU CAN YOU JUST GIVE ME A YES OR A NO ON DINNER [hydrocodone tablets] JUST SO I KNOW WHAT TELL HUNGRY PEOPLE [customers] THANKS BRO?" This text demonstrates that BANNING continued to engage in communications concerning illegal pharmaceuticals even after his July 16, 2007 arrest.

18. On September 29, 2007, monitors intercepted a call between MURRAH and BANNING. During this call, MURRAH told BANNING, "I need to try to grab those chips [money owed for a prior drug transaction] from you as soon as possible, dude."

**BANNING's Connection to Target Location**

19. Vehicle records from the California DMV records identify BANNING's address as the target location. On January 8, 2008, agents obtained utility records from San Diego Gas and Electric (SDG&E) pertaining to the target location. The records indicate that Joel BANNING's brother, Glen A.Banning, maintains the SDG&E account for the target location. Additionally, Joel BANNING's telephone number is subscribed to by his brother, Glen A. Banning. Joel BANNING, or a vehicle known to be utilized by BANNING, have been observed on numerous occasions at the target location, as recently as February 25, 2008.

**Vehicles Associated with Target Subject and Target Location**

20. Joel BANNING has been observed on multiple occasions driving a gray 1995 Toyota Pick-up bearing California license plate number 5B46370 registered in his name. On July 16, 2007, BANNING used this vehicle when he was arrested while being in possession of $1,563 in U.S. currency, 2,000 hydrocodone tablets, and five 80mg tablets of oxycodone.

**SEARCH PROTOCOL FOR COMPUTERS**

21. This section describes the procedures that will be employed during this search to minimize the intrusion represented by the search of any electronic data found at the target location.

22. Searching agents will be asked to use an incremental approach in searching for relevant electronic material. If the agents are able to examine relevant portions of computer drives to identify responsive material within a reasonable time period on-site, then the agents will attempt to create forensic images of computers or laptops seized. However, if the agents cannot perform the search within a reasonable period on-site, will they employ alternate procedures to complete the review off-site. In that case, the computer expert will create forensic images of electronic data sources as necessary to complete the search off-site.

23. A forensic image is an exact physical copy of a computer hard drive or other similar electronic storage media. A forensic image thus captures all of the data on the hard drive (or other media) without the data being viewed and without changing the data in any way. There are many reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. Second, there are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Third, it is only after a thorough examination and analysis, that a trained computer forensic examiner can determine whether he needs to obtain specialized hardware or software (not to mention specialized training on the specialized software) in order to view and analyze the data contained in electronic form.

24. The analysis of data on a computer may also be an extremely tedious and time consuming process. In addition, to requiring special technical skills, equipment and software, it may

take days to properly search a single hard drive for specific data. With current technology, each search "hit" must be reviewed in its context by an agent to determine whether the data is within the scope of the warrant. In other words, merely finding a good "hit" does not end the review process.

25. Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000 megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

26. In addition to the sheer volume, the data may be stored in a variety of formats or encrypted. The volume of data of course extends the time that it takes to analyze the image in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches (e.g., many common electronic mail, database and spreadsheet applications do not store data as searchable text).

27. Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may require off-site analysis.

28. Nevertheless, all forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information that is potentially privileged or not within the scope of the warrant. If so, this information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney so that they can determine whether to seek a further search warrant for the newly uncovered data.

29. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

## SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS

30. With respect to any and all electronically stored information in cellular phones or PDAs at the target locations, agents respectfully request that this Court authorize the agents to access, record, and seize the following:

a. telephone numbers of incoming/outgoing calls stored in the call registry;

b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

c. Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C. § 1956;

d. telephone subscriber information;

e. the stored telephone numbers dialed from the cell phone and/or PDA; and

f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C. § 1956.

31. If the agents cannot analyze the cellular telephone or PDA on site, they may send the cellular telephone or DPA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all analysts or forensic examiners to examine, analyze, and make a record of the contents of the information stored in the seized cellular telephone or PDA.

## CONCLUSION AND SEALING REQUEST

32. Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including controlled substances violations under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering violations under 18 U.S.C. § 1956. There is also probable cause to believe that property constituting evidence of the offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing the criminal offenses will be found in the target location described further in Attachment A.

33. Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further court ordered.

I declare under penalty of perjury that the foregoing is true and correct.

CHRISTOPHER J. SEDMAK
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 5 day of March, 2008.

HONORABLE CATHY ANN BENCIVENGO
United States Magistrate Judge